Germany. You can take the podium. Thank you. May I proceed, Your Honor? Yes, please. May it please the Court. Kenneth McCallion, on behalf of plaintiffs, including Paramount Chief Rukoro, Chief Isaac, Barnabas Katuo, and other representatives who are here today in the courtroom of the Over-Herrero and Nama people of Namibia, Botswana, South Africa, and the United States. I am joined by my co-counsel here today, Michael Lachman and Thomas Holman. As we have fully explained in our papers, it was error for the district court to have granted Germany's motion to dismiss. The extensive record submitted below makes a more-than-nonfrivolous showing under the Helmerich standard to establish jurisdiction under the taking exception of the Foreign Sovereign Immunities Act, section 1605A3. We believe it was also clear error for the court to have denied plaintiffs' motion to supplement the record and or to amend the pleadings in that that supplemental record overwhelmingly, we suggest, and more than We further would like to renew our motion, appellate motion, before this Court to supplement the record and respectfully suggest that this Court's de novo review should be conducted on a complete factual record. There are at least four clear-cut legal errors in the Court below requiring reversal, and in each one of them, the district court ignored the plain text of the FSIA and invented new rules of decision without any support in case law or the text of the statute itself. I'm sorry, you're not arguing the commercial exception, just the takings exception? Yes, Your Honor. While we believe we meet the commercial activity exception for purposes of streamlining this appeal, since we only need one exception, we feel we're extremely strong on the takings exception. The commercial activity exception, A2, is a more complex one. We would withdraw our objection to that for purposes of this appeal to streamline this Court's consideration under the takings exception, 1605A3. Thank you. First, the district court committed clear reversible error by holding that a single commercial transaction is not substantial enough to be commercial activity under the takings exception, even though under the plain language of 1603D of the statute quoted by the district court in its decision, it defines commercial activity as a regular course of commercial conduct or a particular commercial transaction or act. One is more than sufficient. Counsel, could you please explain what the commercial activity is that you're relying on? Yes. The commercial activity is the bone trade engaged in by Germany over the span of at least five decades, including this period of time when the genocide occurred, 1904 to 1908. The taking was a sovereign act. However, instead of just disposing of the bones, they sold them, they stored them, they catalogued them in the State Berlin Museum of Ethnology. They shipped them there and then sold them as part of an international trade, which was extremely robust at that time, for profit. One of those commercial transactions for profit was the sale of this teaching collection collected by von Luschen, the director of the State Museum of Ethnology, to the American Museum of Natural History here in New York in 1924. It was sold for profit, and those records of that sale are documented by us in response to the motion to dismiss in the declaration, the Cattuo Declaration, where attached to it are the exhibits showing the actual sale documents from the Berlin Museum to here for a sum, $41,500. That was part of a, and the collection that was sold, 5,200 specimens, included both the bones and human remains of our victims from this genocide, but also other purchases of Mohawk, other Indians' remains from the United States, indigenous peoples, and elsewhere in the world that were collected in the museum. It was a very profitable business. So, is it relevant here that that was a single completed transaction? There were two shipments from Berlin. It was, the sale documents show it was one sale and commercial transaction, but encompassing 5,200 specimens, as opposed to, for example, the one promissory note in the U.S. was sufficient to establish commercial activity having substantial contact within the U.S. We would respectfully suggest that the sale of 5,200 human remains for profit is at least or more of a significant commercial substantial contact with the United States than Bolivia. And how does the New York real estate piece of the allegations fit into this takings theory? Yes. The takings, as the court below found, and there was no notice of, cross notice of appeal on the issue, so the court should accept the analysis of the lower court that the profit of the sale of the bones and the lease of lands that were expropriated from the plaintiffs, it was a very lucrative sale of those lands and mineral rights were commingled in the German treasury, were used to purchase property in New York. So the only real issue before this Court is, are those buildings here in New York by Germany, are they being used in connection with commercial activity carried on by Germany? And we would argue that that's one of the major legal errors by the court below, which to the statute a requirement that the primary purpose of the use of the buildings, the four buildings that Germany owns here, be for commercial purposes. The court appears to have conceded that there was some commercial use. In fact, it cited language from the Restatement III that really any commercial relationship is commercial activity, but found even though there was commercial activity, it was not sufficient for the statute because it grafted on this primary purpose requirement, even though we showed that the Fifth Avenue building called the Haunted Castle, for example, here in New York that Germany owns may be used for art and exhibitions for profit, commercial purposes. And you trace the proceeds from the genocide to the purchase of the property? That was, yes, done to the lower court's sufficiency with expert testimony from an economist, Dr. Smith, and the court had an extended analysis of that. That's the part of the lower court decision we particularly like. We think it's accurate. And the court spent a lot of time analyzing that, that at least for purposes of the pleading requirement, there was a more than frivolous, more than sufficient showing on that particular point. However, the court diverted from us and found against us on the commercial activity of the buildings here in New York. Your time has expired. Do you want to just take a moment or two in summary of your position? Excuse me, Your Honor? Your time has expired. Oh, okay. So do you want to summarize before you have three minutes for rebuttal? Yes. Did you want to just summarize now the argument that you're making, and then I'll turn to the defendants? Yes, of course. The four legal exceptions are summarized. The four legal errors are summarized in our papers. I've already discussed the buildings. Perhaps more significantly, and maybe I can get into it in rebuttal, it's the definition of carried on in 1605A1, the first clause. Very importantly, the Court's reliance on Schubert versus Germany only applies to the second prong, not applicable here in 1605A3, requiring an ongoing commercial activity, is engaged in the plain language of the statute. The plain language of the statute, carried on, is past participle, past tense. For example, we are here in the Second Circuit in connection with a genocide carried on, past tense, by Germany in 1904 to 1908. So we think the clear statutory definition was not followed by the Court below, and we would ask this Court to reverse and adhere to the plain language of that statute. Thank you, counsel. We'll hear from the defendant appellees. Good morning. May it please the Court. My name is Jeffrey Harris. I'm accompanied by my partner, Walter Dirks. The first thing I'd like to say to the Court is you heard a lot of content from Mr. McCallion. The problem is, and we pointed this out in our brief, most of it is not in the complaint that they filed, nor in the amended complaint. For example, with regard to the question you asked about commercial activity, what the complaint and the amended complaint allege that this Professor von Luschen, his widow, some three years after he died, donated or sold the skulls that he mentioned and the bones to the museum in New York. That was not an act of Germany. That was a private act by the widow of the Professor who, during his lifetime, had collected these. The ---- Didn't they first go to a museum in Germany? The Professor, during his lifetime, one of the ---- he worked at the museum. So that's where they were in custody. They were in his custody at his workplace in the museum. He dies, and his wife either donates or sells them to the museum in New York. Without the interference of the Republic of Germany. That is correct. Now, that's what was alleged. This is not our facts. That's what's alleged in the complaint and the amended complaint. After oral argument before Judge Swain, the plaintiffs sought to file a supplemental filing, which Judge Swain didn't allow because, one, it occurred three months after oral argument, some two and a half years into the case, after the filing of the original complaint and amended complaint, and she found that it was undue delay. That supplemental filing that they sought to put in the record, and was not in the record that Judge Swain decided this case on, doesn't add facts. It contradicts directly what they said in the ---- what they alleged in the complaint. So this isn't filling in the borders with some facts that sort of elucidate. It's a direct contradiction of what they alleged in the complaint. The basic problem that I have here, and I had it in reading their briefs and in hearing the argument this morning, is what we have here is a homogenization of the record that was before Judge Swain and facts and things that they sought to put in which aren't in the record. And they are alleging that Judge Swain made error, but on the record before her, she decided this case correctly. There's no question about that. But they claim also that she abused her discretion in denying the motion to amend. Right. So the chronology of that is that this case was filed in 2017. About six months later, I believe it was, an amended complaint was filed. We went through two full briefing cycles on Germany's motion to dismiss. We had extensive oral argument in July 2018. And it wasn't until October of 2018, presumably in a time when Judge Swain was writing her opinion, that like an anvil from the sky, this motion to file a supplement appears. Judge Swain found that because there had been two, there was a complaint, an amended complaint, two full briefing cycles, and then three months after oral argument, a motion to supplement, she found, one, that the material that they sought to supplement was available to them for decades, that this wasn't, quote, newly discovered or information which was heretofore unavailable. This was available, Judge Swain found, to the plaintiffs for decades. And given that chronology and the fact that all this information that they sought to put in three months after oral argument had been readily available, that she found that to be undue delay, and she did not abuse her discretion in denying that motion. So you address the takings exception to the FSIA and your friend's argument about commercial activity conducted by your client in the United States through certain real estate? Sure. Initially, the claim by the plaintiffs was that there were four pieces of real estate in New York which were, which, in which Germany was engaged in commercial activity. I think they've dropped three of them and we're down to the fourth one, which is what Mr. McCallion referred to as the haunted house. It's a property on Fifth Avenue. That property, Judge Swain found, based on their allegations, is used for promoting German culture, promoting German tourism. There were some commercial contracts led on that property for the rehabilitation of the building. And Judge Swain correctly found that the law is that that ancillary commercial activity, such as hiring janitors, hiring contractors, is not under FISA the required commercial activity. Nor is the German government's use of the building to promote culture and trade that also, the case law which we cite in our brief, is not the kind of commercial activity that satisfies the requirement under FISA. What is required for commercial activity? Well, for example, at one time Germany operated Lufthansa Airways. And if they were engaged in selling airplane tickets in New York to fly on that airline when they owned it, that would be commercial activity. Is the definition for profit or what's the standard that you're articulating and where is it found in the case law? Well, it's not specified in the statute. The statute says carried, commercial activity carried on. And by the way, just let me hesitate here a second to say that we believe that the statute, when it uses the term carried on, it's a requirement that it has to be commercial activity which is currently being carried on, not commercial activity. Commercial activity that was carried on in 1924. What about, do any of the cases suggest your interpretation? Well, what suggests the interpretation that I've asked you to consider is that the second phase of the expropriation exception, which applies to agencies and instrumentalities, requires clearly current commercial activity. And this Court in the Garb case, Garb versus I believe it was Poland, said that the standard for commercial activity in the first prong, which is that which applies to foreign sovereigns, is a higher standard than that which applies to agencies and instrumentalities. And from there, I suggest to you that if it requires current commercial activity for the first prong, it's a higher standard than that which applies to agencies and instrumentalities. And I suggest that you consider the lower standard, namely the agency or instrumentality, the second section. We have not said exactly that in a case. Isn't that correct? Excuse me? We have not said that exactly. No, you haven't said it exactly. What you have said is that the standard to hold the foreign sovereign under the expropriation exception is a higher standard than the one to hold the agency or instrumentality. So that's what you've said. And from there, I extrapolate out to what I suggested to the Court today. I'd like to spend — I have a minute and 18 left. I'd like to spend a little bit on this. We have asked the Court or suggested to the Court that there is an additional ground for affirmance, and that is the ruling by Judge Swain that there was a tracing of the money, and that money was — They liked that part of her decision. They loved it. I frankly thought that — well, I won't tell you what I thought. But here's the point about the tracing. We suggest — ask the Court to take judicial notice of the fact that Germany went bankrupt twice, at the end of World War I and the end of World War II. And the notion that property that they seized or turned into cash or whatever they did with it in the late 1800s, in the first decade of the 1900s, somehow can be found on Fifth Avenue in that building is simply wrong. And if you think about that, the FISA would mean nothing if, for example, any time there is an expropriation and the country that expropriated owns real estate in the United States, if that is sufficient in and of itself to show a tracing, then FISA means nothing. What I would suggest is that while tracing is a viable theory, in this case, that's all it is, is a viable theory. There was no showing of tracing. And I suggest that Judge Swain should have considered the fact, which is public knowledge and judicially noticeable, that Germany lost World War I, went bankrupt, lost World War II, was penniless, and that to say that this new property in the 21st century in New York can be traced to the taking of the plaintiff's property in the 1880s and early 1900s doesn't wash. So what I'd suggest to you is if you look at the record that Judge Swain had before her, look at her opinion and keep that in mind, as opposed to all these ancillary matters that infiltrated their brief and their argument, you will find that she made no error. And that additionally, the tracing argument is an additional grounds for affirmance. Thank you very much. Thank you, counsel. Mr. McCallion, you've reserved three minutes for rebuttal. Yes, it's clear from my colleague's argument that there are serious factual issues in dispute, which on a motion to dismiss should have been resolved in plaintiff's favor, with all inference drawn in our favor. And he keeps saying that the plaintiffs failed to prove this, failed to prove that. We had no burden of proof on the motion to dismiss under this. We take as true everything alleged in your complaint. Absolutely. And we allege in our complaint, supplemented by our motion papers, that this collection of bones that was sold by the museum was in the possession of the museum. So when Mr. Harris says, well, it was just they said originally it was a private collection, we never said it wasn't in the possession of the German museum. But this just highlights a factual issue in dispute which cannot be resolved at an early pleading stage, certainly in a case as important as this one, a genocide case, there should be at least the application of the burden of a more than non-frivolous argument, certainly the ultimate burden, the case law is clear that the ultimate burden to prove that an exception doesn't apply still lies with Germany. And when Mr. Harris says that there is no definition of commercial activity in the statute, as I said in our papers and in my argument, 1603d specifically defines commercial activity and does not require any proof or evidence of profit motive. It merely shows the nature of the activity defines commercial activity, not for profit. So there are all kinds of requirements that Germany says we fail to show which are not required by the statute or grafted onto the statute. Also, it's clear that delay, this Court and other courts, delay is not a significant ‑‑ is an insufficient grounds to deny a motion to amend. There must be a showing of significant, we suggest, prejudice to the other party. And when this Court weighs the equities here, we have the basically marginal inconvenience to Germany of having to brief another motion on a full record versus the prejudice to the plaintiffs who Germany has admitted are the victims of mass murder and genocide being ‑‑ having no judicial relief. Clearly, we think that weighing of the equities, delay is not sufficient. We corrected the record. Yes, in the original amended complaint, we said it was a private collection. That's what an expert had told us. And then we found out through further research that this was a collection by the Berlin Museum. And really the shame of this is that they've never denied that this Berlin Museum is a state museum, nor could they. The website for this museum clearly states that since it was established in 1873, it was a Prussian museum. They don't deny it. They wouldn't deny it here. They don't deny it in their papers. And yet the Court imposed a hyper rigorous standard on the plaintiffs saying, oh, we didn't prove that it was a state museum. As a result, the decision by the Court below was made on an erroneous basis of fact. We proved in our supplemental record overwhelmingly that it was sold by a German state museum. Was this the supplemental record that the district court didn't allow you to file? Correct. However, our original filing, the Cattuo Affidavit, we defined it as a German state royal museum. That on its face was more than a non-frivolous showing. We also had documentation relating to that. Then we offered a second amended complaint correcting that and other things, and Mr. Lachman submitted a very extended scholarly supplemental declaration meeting all of the filler standards under the filler case, establishing why this state museum was an insubstantial instrumentality of the German government. And also we would respectfully suggest that the Phillips case in the D.C. circuit, Germany actually admitted and conceded that the parent umbrella organization of these Berlin museums, the Prussian Cultural Heritage Foundation, was a German instrumentality. They haven't denied it. They can't deny it. Certainly you can just go to the website and see it, and yet plaintiffs are thrown out of court below, denied any judicial remedy based on factual findings without any fact-finding hearing, without any discovery in this case, and without the application of the clear standard to be applied, that all we have to do is have a non — make a non-frivolous showing. Yes, did we make an error in originally pleadings? Yes, we corrected that. On a hypotechnical basis, should we be thrown out of court? Should these people be denied relief? The district court said you had this information for a long time. That's not hypotechnical. You're supposed to bring all your information to the court with your complaint and your amended complaint. She said you knew all of this before you submitted it, for years, she said. Oh, well, she said we could have known. In 2017 was the first time all the experts and ethnologists and others, they didn't know the bones of our victims were in the American Museum of Natural History. They didn't know about this transaction. Until 2017, we had filed our original complaint. Based on that information, we filed our amended complaint. We went to the museum. We looked at some of the records. But because of the controversy in this case, we were then excluded from researching the issue. So the court made a finding that we could have in some theoretical sense, but nobody had ever found it. Not the experts from Germany or anywhere else knew that in the basement of that museum. It wasn't on display were the bones of the plaintiff's ancestors until 2017 when we started our research. I mean, there have been Holocaust cases before this court where 70 years after the end of the Holocaust, some records are found in an attic. Certainly not in a Holocaust genocide case. A court would never exclude evidence which is found 70 years later. Could they have cleaned out their attic and done spring cleaning, you know, for 70 years before that? Sure they could. But we live in an imperfect world, and there was certainly no bad faith, and there wasn't an effort by plaintiffs as soon as they could to have volunteer lawyers, to have volunteer experts try and get to the bottom of this. The bones in the accession records were not on the internet. They're in a basement. And we can only get to it if the museum allows us to go there. These are not public documents. So the court imposed a more than hyper-technical requirement, rigorous standard on us. When we came up with evidence, we corrected the record, we supplemented the record, and met all of the filler standards for the definition of the state museum and also Germany's bone trade. So we respectfully suggest that equity and elemental fairness require that this court, which is a private collection, to make a de novo review, because the court found that, for example, our amended complaint, it would be futile to follow that, because this was a private collection rather than public, despite, and we're going to exclude, we're not going to look at that record. This court can make a review on that fulsome record at this particular point or remand it for that review, and we suggest in this case of this importance, where this is really the ultimate and the only forum that the victims of this genocide can seek a judicial remedy, that any decision be made on that full and fair record. Thank you. Thank you both. We'll reserve decision. I'll give you a moment to clear out.